Filed 5/8/25  P. v. Carrera CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B332330 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA092084-01) |
| v. | |
| NESTOR DANIEL CARRERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Thomas Rubinson, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Nestor Carrera appeals from his judgment of conviction of murder (Pen. Code,[1] § 187, subd. (a)), attempted murder (§§ 187, subd. (a), 664), shooting at an occupied vehicle (§ 246), shooting from a motor vehicle (§ 26100, subd. (c)), and unlawful possession of a firearm (§ 29800, subd. (a)(1)), with true findings on firearm enhancements (§ 12022.53).  On appeal, Carrera argues the trial court erred in admitting:  (1) the prior testimony of a witness based on his unavailability at trial; (2) text messages between Carrera and his girlfriend following the crimes; (3) photographs of a firearm that were posted on Carrera's social media account; and (4) evidence that Carrera's girlfriend pled no contest to an accessory charge in this case.  He also asserts the trial court erred in sentencing him on three of the firearm enhancements. We conclude Carrera has failed to demonstrate error in his convictions or sentence, and accordingly affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**1.    Charges**

In an information, Carrera was charged with the first degree murder of Yoceline Zuniga (§ 187, subd. (a); count 1), the attempted willful, deliberate, and premeditated murder of Angel Palomares (§§ 187, subd. (a), 664; count 2), shooting at an occupied vehicle (§ 246; count 3), shooting from a motor vehicle (§ 26100, subd. (c); count 4), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5).  As to counts 1 through 4, it was alleged that Carrera personally and intentionally discharged

---

[1]    Unless otherwise stated, all further undesignated statutory references are to the Penal Code.

a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d).

## 2. Evidence at trial

### 2.1 Events surrounding the drive-by shooting

On the night of December 14, 2019, a gray sedan pulled up next to a white BMW on a street in Van Nuys, California. Palomares had been driving the BMW, which was stolen, and his girlfriend, Zuniga, was in the front passenger seat. A person in the gray car fired a shot into the passenger window of the BMW, striking Zuniga in her right temple. When Palomares saw that Zuniga was shot, he drove the BMW to his parents' home, and his parents called 911. Zuniga died from a single gunshot wound to her head.

At the time of the shooting, Palomares was a member of the MS-13 gang, and Carrera was a member of the rival North Hollywood Locos gang. The shooting occurred in an area claimed by the North Hollywood Locos. A parking lot near the shooting contained North Hollywood Locos graffiti and crossed-out MS-13 graffiti. Inside the BMW, the police found a can of blue spray paint and notebooks with gang names crossed out. MS-13 gang members were known to use blue spray paint for their graffiti, and to make drafts of their intended graffiti in notebooks.

A few weeks before the shooting, Palomares was walking along a street when a gray car pulled up next to him. A man inside the car asked Palomares, "Where you from?" Palomares replied, "I don't bang." After the shooting, Palomares told the police that the man from this prior incident looked like the person who shot Zuniga and was driving the same gray car. During this incident, the man also said, "Fuck Mierdas," a derogatory reference to the MS-13 gang.

3

Two days before the shooting, David Rojas, a North Hollywood Locos member, was captured on surveillance video near the scene of shooting. The video showed a gray sedan stopping in an alley. Both Rojas and the driver exited the car, and began spray-painting North Hollywood Locos graffiti over MS-13 graffiti on the nearby walls. At trial, Rojas denied knowing the person who was with him during the spray-painting incident. But in a prior interview with the police, Rojas identified that person as a "shot caller" in the gang known as "Klown" or "K," and the gray car as a Chrysler belonging to Klown. Rojas also stated that he was with Klown in the Chrysler the day after the shooting. At that time, Klown told Rojas a "conflict" or "incident" happened, but he did not provide details and later left to North Carolina. Rojas further stated that, around the time of the shooting, he saw Klown with a .357 chrome revolver that was not a "snub nose" gun. During the interview, the detective told Rojas, "You knew what was going on. You knew that he had done it." In response, Rojas stated, "Yeah."

In late 2019, Carrera was living with his girlfriend, Julianna Hurtado, about a half mile from the scene of the shooting. A few weeks after the shooting, Carrera and Hurtado drove to her cousin's home in North Carolina. According to Hurtado, she later returned to California for her job, while Carrera remained in North Carolina to find work. While Carrera was staying in North Carolina, Hurtado provided him with financial support. She also communicated with Carrera on a cell phone that she began using at the end of December 2019. Hurtado later pleaded no contest to a charge of being an accessory after the fact.

4

## 2.2    Police investigation

Following the shooting, Palomares participated in several police interviews during which he gave conflicting accounts of the incident.  When Palomares first spoke with the police outside his parents' home, he said the shooter's car was a gray Chrysler or Dodge.  Palomares claimed that Zuniga's friend was driving the car they were in, and that he was in the backseat.  When Palomares was taken to the scene of the shooting, he told the police that he purchased chips from a vendor in a nearby apartment complex.  He was walking back to the BMW when a car pulled up and the driver fired a shot.  He described the shooter's car as a dark gray Chrysler or Dodge, and said he had seen the car before, but he did not recognize the shooter.  The officer who interviewed Palomares at the scene thought that his description of where the cars were positioned during the shooting was not consistent with the angle of the shot.  The officer also did not believe that a MS-13 gang member would go into a rival gang's territory to buy a bag of chips.

An investigating detective assigned to the case testified that, during an unrecorded interview, Palomares described a "car to car" shooting.  Palomares recounted that he was driving with Zuniga when a gray Chrysler sedan pulled up next to them, and he heard a gunshot.  Palomares also said that he recognized the Chrysler from a prior "hit up," and described the person involved in that incident as a heavyset Hispanic man.  In a later recorded interview, Palomares told the lead detective that, while the shooter looked familiar, he "didn't see him like, good."  He also said the shooter's car "looked like" a Chrysler 200, but when he was shown a photo of that make and model, he denied it was the type of car involved in the shooting or prior hit up.  He said that,

5

while the shooter's car "looked like" the one from the prior incident, "it was not the same guy, same car."

The police did not find any bullet casings or other physical evidence at the scene of the shooting. The police did retrieve surveillance video of the area around the time that the shooting occurred. The video showed a gray car stopping along the passenger side of a white car, and then both vehicles taking off in the same direction. When shown the video at trial, Palomares confirmed that he was driving the white car, and that the gray car was the one involved in the shooting.

The police obtained records from two Facebook accounts belonging to Carrera. The owner of the accounts was listed as "Junior Lokks," and messages sent to one of the accounts referred to him as "klowner" or "clowner." The records showed that, in 2019, Carrera planned to meet with the seller of a Chrysler 200 sedan, and that he later posted messages inquiring about car maintenance and parts for a 2011 Chrysler 200. The records also showed that, in June 2019, Carrera and another user discussed MS-13 graffiti that they found disrespectful and a plan to take action while being armed. On November 30, 2019, a few weeks before the shooting, Carrera posted the message, "Ola loko fuck mierdas." That same day, he also sent two photographs of a black handgun to another user. Two days later, that user asked, "Sup the toy papa," to which Carrera replied, "I kept it."

The police also obtained records for two cell phones associated with Carrera. On December 14, 2019, there was no activity on Carrera's cell phone around the time of the shooting, but the device appeared to be within 300 meters of the area where the shooting occurred. That phone was last used on December 27, 2019, and then moved from Los Angeles to

6

North Carolina over the next few days.  In January 2020, Carrera and Hurtado began communicating with one another on new cell phones.  In text messages to Carrera, Hurtado complained about driving for three days with no sleep, paying his debts, and borrowing money to support him.  She also threatened Carrera that if he did not pay her back, she would tell everyone the truth about why he left California, including a friend who was dating a deputy sheriff.  Some of Hurtado's messages to Carrera included statements such as "[i]f you can't do the time, don't do the crime," and "[i]f u didn't do what u did, u wouldn't be there right now."  In late January 2020, Hurtado texted Carrera that his "secret is safe," and she warned him that he should not talk "about anything illegal you do."

On January 30, 2020, officers in North Carolina arrested Carrera as he attempted to flee through the rear window of a residence.  At trial, the parties stipulated that Carrera was a person prohibited from carrying a firearm under section 29800.

### 2.3 Gang expert testimony

Both the prosecution and the defense called gang experts to testify at trial.  The prosecution's gang expert, Los Angeles Police Officer Claudia Guillen, described the various signs, symbols, and geographical areas claimed by the MS-13 and North Hollywood Locos gangs.  She opined that Palomares was a MS-13 gang member, and Carrera was affiliated with the North Hollywood Locos.  The location of the shooting in this case was considered a stronghold of the North Hollywood Locos.  The presence of MS-13 graffiti in that area would be seen as disrespectful to the North Hollywood Locos, and would likely lead to an act of retaliation.

The defense expert, Martin Flores, testified that there were several gangs in the area near the shooting that used the name

7

"locos," and that the North Hollywood Locos gang had a heavy presence in that area. Flores also opined that Palomares was a member of the MS-13 gang, and that Carrera was a member of the North Hollywood Locos. Based on photographs of Palomares that were posted on his Instagram account, Flores noted that Palomares appeared as "banged out as you can get," and that anyone in that area would recognize him as a MS-13 member. On cross-examination, Flores testified that if a MS-13 gang member carrying a spray can went into North Hollywood Locos territory alone and unarmed, "that's a death sentence."

### 3.    **Jury verdict and sentencing**

At the conclusion of the trial, the jury found Carrera guilty of the first degree murder of Zuniga (count 1), the attempted willful, deliberate, and premeditated murder of Palomares (count 2), shooting at an occupied vehicle (count 3), shooting from a motor vehicle (count 4), and possession of a firearm by a felon (count 5). On count 1, the jury found that Carrera personally and intentionally discharged a firearm causing death or great bodily injury under section 12022.53, subdivision (d). On counts 2 through 4, the jury found that Carrera personally and intentionally discharged a firearm under section 12022.53, subdivision (c).

The trial court sentenced Carrera to an aggregate state prison term of 100 years to life. On count 1, the court imposed a term of 25 years to life for the murder of Zuniga, plus 25 years for the firearm enhancement. On count 2, the court imposed a consecutive life sentence for the attempted murder of Palomares, plus 25 years for the firearm enhancement. The court stayed the sentences imposed on the remaining counts under section 654.

Carrera filed a timely appeal.

8

## DISCUSSION

### 1. Admission of Palomares's prior testimony

Carrera contends the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted Palomares's preliminary hearing testimony at trial. Carrera specifically claims Palomares was not an unavailable witness within the meaning of Evidence Code sections 1291 and 240, because the prosecution failed to take reasonable steps to secure his presence at trial. We conclude the trial court did not err in admitting Palomares's preliminary hearing testimony.

#### 1.1 Relevant background

The preliminary hearing was held on December 28, 2022. At the start of the hearing, the trial court noted that attorney Tom McClarnon "was appointed by the court to advise Mr. Palomares relating to possible Fifth Amendment privilege issues." Palomares then testified at the hearing under an agreement that his testimony would not serve as the basis for a prosecution by the district attorney's office. The only other witness to testify at the hearing was a detective assigned to investigate the case.

On June 30, 2023, trial was set for a stipulated date of July 6, 2023. Trial was then continued to another stipulated date of July 12, 2023, when jury selection commenced. On that date, the prosecution filed a trial brief in which it requested that Palomares's preliminary hearing testimony be read to the jury because he was unavailable for trial. The prosecution represented that its investigator had been diligent in his efforts to locate Palomares, and believed that Palomares was actively avoiding contact. In response to the prosecution's request, the trial court set a due diligence hearing.

9

At a hearing held on July 17, 2003, District Attorney Investigator John Williams testified about his prior contact with Palomares and attempts to subpoena him to appear for trial. On November 22, 2022, Williams successfully served Palomares with a subpoena to appear at the preliminary hearing. Palomares was cooperative at that time. Following the preliminary hearing, Williams had a telephone conversation with Palomares on June 27, 2023 in an effort to secure his trial attendance. Palomares said he was "homeless and bouncing from different places." He also said he "testified already and did not want to return to court." Williams believed he was able to convince Palomares to meet with him at a fast food restaurant the following day. But a few minutes later, Palomares texted Williams that they could not meet after all because he did not have a car.

Williams then began trying to locate Palomares by visiting places where he might be found and speaking with his family members. Williams went to Palomares's family home where he previously was served, but Palomares was not there and his family denied knowing his whereabouts. Palomares's mother said that she had not spoken to him in three months and believed he was using narcotics. His cousin reported that Palomares moved out of the family home a few years ago, and rarely returned to visit. His uncle likewise confirmed that Palomares no longer lived there. Williams also visited the residence of a woman who recently had a child with Palomares. She said that she had not heard from Palomares since they ended their relationship a couple of months earlier.

Williams spoke to Palomares's last known employer who reported that Palomares was laid off four or five months earlier

due to a substance abuse issue. Because his family thought Palomares might have checked into a rehabilitation facility, Williams contacted some nearby facilities, but did not locate him. Williams also went to the fast food restaurant where he and Palomares initially planned to meet, and showed Palomares's photo to the employees there, but they did not recognize him. In addition, Williams contacted four local hospitals, none of which had Palomares registered as a patient.

On July 11, 2023, Williams searched for Palomares in the death records of the Los Angeles County Coroner's Office, and the custody records for Los Angeles, Ventura, Riverside, and Orange counties. On July 17, 2023, Williams again checked the custody records for Los Angeles County. Palomares's name was not found in any of these records. Since June 27, 2023, Williams had been calling and texting Palomares on a regular basis, but received no response.

On cross-examination, Williams testified that he was not aware that Palomares was represented by an attorney at the preliminary hearing, and had not contacted that attorney. He also acknowledged that he had not checked with any homeless shelters.

The trial court found that the prosecution exercised due diligence in attempting to secure Palomares's testimony at trial, and that Palomares was an unavailable witness within the meaning of Evidence Code section 240. In making its ruling, the court stated: "[It] seems to me that Mr. Williams made an effort of a substantial character. He began several weeks before the trial was due to start. This is a very important witness, and I believe that he had explored the leads that he had in a competent and comprehensive manner. There's just nothing

11

there on Mr. Palomares." The court permitted the prosecution to read Palomares's preliminary hearing testimony to the jury.

### 1.2    Governing law

A criminal defendant has a right under both the federal and state Constitutions to confront witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "Although the constitutional right of confrontation is important, it is not absolute. [Citation.] If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted." (*People v. Wilson* (2021) 11 Cal.5th 259, 290.) In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court recognized that, under the Sixth Amendment, the "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id*. at p. 59.)

In California, Evidence Code section 1291 codifies this traditional exception to the right of confrontation. (*People v. Wilson, supra*, 11 Cal.5th at p. 290.) It provides, in relevant part, that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).) Our Supreme Court has recognized that "[t]he constitutional and statutory requirements are 'in harmony.' " (*People v. Smith* (2003) 30 Cal.4th 581, 609.) "Thus, when the requirements of [Evidence Code] section 1291 are met, the admission of former

12

testimony in evidence does not violate [the] constitutional right of confrontation." (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

Under Evidence Code section 240, a declarant is "unavailable as a witness" if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (*Id.*, subd. (a)(5).) "The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*People v. Herrera, supra*, 49 Cal.4th at p. 622.) "[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*Id.* at p. 623.) Where the relevant facts are undisputed, we independently review a trial court's determination of due diligence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675.)

### 1.3 The trial court did not err in admitting Palomares's preliminary hearing testimony

Carrera argues Palomares was not an unavailable witness because the prosecution failed to establish that it made a timely and reasonable effort to procure his attendance at trial. Based on our independent review of the record, however, we conclude the prosecution satisfied its burden of showing due diligence.

The record reflects that the prosecution began trying to secure Palomares's presence for trial on June 27, 2023, which

13

was nine days before the anticipated trial date. At that time, the district attorney's investigator, Williams, did not have any difficulty reaching Palomares on his cell phone, but he learned then that Palomares was no longer willing to testify. Williams began making multiple attempts to locate Palomares. He visited Palomares's last known residence as well as the residence of his former girlfriend, and spoke with three members of his family, each of whom denied knowledge of Palomares's whereabouts. Williams also spoke with Palomares's last known employer, contacted nearby rehabilitation facilities based on reports that Palomares might have a substance abuse problem, and showed Palomares's photo to staff at the fast food restaurant where they planned to meet. In addition, Williams consulted local hospitals and the county coroner's office, and checked custody records for Los Angeles and the surrounding counties. Meanwhile, Williams continued to regularly call and text Palomares on his cell phone from his June 27, 2023 disappearance through the July 17, 2023 due diligence hearing. These efforts to locate Palomares, although not exhaustive, demonstrated reasonable diligence.

Carrera asserts that Williams should have reestablished contact with Palomares earlier in the proceedings because his testimony was critical to the prosecution's case. As our Supreme Court has observed, "we consider the import of [the witness's] testimony in evaluating the reasonableness of the prosecution's efforts." (*People v. Wilson*, *supra*, 11 Cal.5th at p. 293.) While the prosecution must exercise due diligence, it is "not required 'to keep "periodic tabs" on every material witness in a criminal case,' " and "is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing."

(*People v. Wilson* (2005) 36 Cal.4th 309, 342.)  Here, Palomares may have been a material witness, but Williams had no trouble securing his presence at the preliminary hearing, and Palomares testified at that hearing under an agreement that granted him immunity from prosecution.  Given that the immunity agreement also required Palomares to testify at trial, the prosecution had no reason to suspect he would flee and risk facing criminal charges. Under these circumstances, the prosecution's efforts to secure Palomares's presence at trial were not dilatory.

Carrera also claims the prosecution should have taken additional steps to locate Palomares, such as checking homeless shelters or encampments, and contacting the attorney who was appointed to represent Palomares at the preliminary hearing. However, as the trial court noted, while "[i]t would have been better had [Williams] checked homeless shelters knowing that the witness was homeless," the efforts that he did make to find Palomares were "more than reasonable."  Further, there is nothing in the record to suggest that Palomares's court-appointed attorney for purposes of the preliminary hearing continued to represent him in any capacity after that hearing concluded. In any event, where, as here, the record shows the prosecution exercised reasonable diligence to secure a witness's presence at trial, "the circumstance that 'additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion.  [Citation.]  It is enough that the People used reasonable efforts to locate the witness.' " (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 677.)  Because the prosecution exercised reasonable diligence in attempting to locate Palomares, the trial court did not err in finding that Palomares was an unavailable witness and admitting his preliminary hearing testimony.

## 2. Admission of text message exchanges between Carrera and Hurtado

Carrera argues the trial court erred in admitting certain text messages he exchanged with his girlfriend, Hurtado, under the adoptive admission exception to the hearsay rule. He also asserts that, because these text messages were not admissible, the trial court erred in giving the standard jury instruction on adoptive admissions. We conclude there was no error in the admission of the text messages or instruction to the jury.

### 2.1 Governing law

A trial court has broad discretion in ruling on the admissibility of evidence. (*People v. Fayed* (2020) 9 Cal.5th 147, 189.) " 'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931; accord, *People v. Caro* (2019) 7 Cal.5th 463, 503.)

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id*., subd. (b).) Evidence Code section 1221 sets forth an exception to the hearsay rule for adoptive admissions. Under this exception, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (*Ibid.*)

16

" 'In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that:  (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true.'  [Citation.]  If so, the jury then determines whether these preliminary facts actually occurred." (*People v. Dalton* (2019) 7 Cal.5th 166, 229.) " 'For the adoptive admission exception to the hearsay rule to apply, no "direct accusation in so many words" is necessary. [Citation.]  Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so.' " (*People v. Charles* (2015) 61 Cal.4th 308, 323.)

### 2.2  The trial court did not err in admitting the challenged text messages and instructing the jury on adoptive admissions

Carrera challenges the admission of three sets of text messages that he exchanged with Hurtado in the weeks after the shooting while he was in North Carolina.  The first set of texts occurred over a seven-minute period on January 27, 2020. Hurtado told Carrera, "Don't talk about why you left [¶] California," and "Don't talk about anything illegal you do."  She also told him to say that "work in California slowed down all of [the] sudden," he "started having problems" with her and his friends, and he "came here to work and it's been slow."  Carrera's only response to these texts was the letter "K," which he repeated three times.

17

The second set of texts messages were sent on January 20, 2020. Over a four-minute period, Hurtado told Carrera, "Control your anger . . . your [sic] in the position your [sic] in because you can't control your anger," to which Carrera replied, "Kus a stupid bitch like u pushed me [in] that direction." Hurtado then wrote, "No your anger put you in that position," "If u didn't do what u did u wouldn't be there right now," "Take responsibility for WHAT YOU DID," and "Only you no one else[]." In response, Carrera stated, "Stop texting me. [¶] Before I block u."

The third series of text messages were sent on January 12, 2020, during an argument about Hurtado's financial support of Carrera and his failure to repay her. At one point, Hurtado stated, "Send me my money by tonight or I'm going to tell everything," to which Carrera replied, "Go ahead u already done that." Hurtado also told Carrera, "You fucked over yourself," "You did what u did I [didn't] help u," and "If you can't do the time don't do the crime." In response, Carrera stated, "Yeah that's y I'm going back tomorrow." When Hurtado then accused Carrera of "crying like a bitch because u [didn't] want to go to jail," he responded that he "never cried over jail." Later in the exchange, Hurtado threatened that, if Carrera did not answer his phone, she would tell her relative the truth about why he had to leave California, which would cause her relative to "kick [him] out." Carrera replied, "I'm leaving I'll give u ur lame ass ur money when I see western union." These texts were sent over an approximately 10-minute period.

On appeal, Carrera contends Hurtado's statements in these text exchanges should have been excluded because they did not qualify as adoptive admissions. In particular, Carrera claims the statements were too vague and ambiguous to warrant a response,

18

and even if they could be considered accusations of a crime, he either denied them outright or refuted their implications. As our Supreme Court has explained, however, the adoptive admissions exception can apply even where a "direct accusation in so many words" is not made. (*People v. Fauber* (1992) 2 Cal.4th 792, 852.) " 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*People v. Geier* (2007) 41 Cal.4th 555, 590.)

Here, the text exchanges between Hurtado and Carrera supported a reasonable inference that Hurtado accused him of leaving California because he committed a crime that would have led to his incarceration if he stayed, and that Carrera did not deny those accusations because he knew them to be true. For instance, the January 27, 2022 messages reasonably could be read as Hurtado advising Carrera not to tell anyone that he left California because of his criminal activity there, and suggesting a cover story for why he left. While Carrera's repeated response of "K" may not have been an express agreement with Hurtado's advice, it was equivocal enough to be considered a tacit admission that he left California in order to evade arrest. Likewise, Hurtado's January 20, 2020 messages reasonably supported an inference that she was accusing Carrera of needing to stay in North Carolina because he committed a crime out of anger and did not want to accept responsibility for it. Rather than deny that accusation, Carrera's response was to blame Hurtado for "push[ing] him [in] that direction," and then tell her to stop texting him. Similarly, in her January 12, 2020 messages,

19

Hurtado threatened to tell others the truth about why Carrera had to leave California if he did not repay her, and implied that he committed a crime for which he would be incarcerated if he returned. Carrera again did not deny Hurtado's assertions and instead agreed to send her money. Accordingly, when these text exchanges are considered in context, the trial court reasonably could find that Hurtado's statements were admissible, and that it was for the jury to decide whether Carrera's responses, or lack thereof, actually constituted adoptive admissions.

Citing *People v. McDaniel* (2019) 38 Cal.App.5th 986 (*McDaniel*), Carrera asserts the evidence was insufficient to establish that he adopted any of Hurtado's accusatory text messages by failing to respond to them since he could have done so through other means of communication. In *McDaniel*, the defendant and his mother engaged in a heated text exchange that began with the defendant telling her to " 'Stop telling lies!!!' " and ended with his mother accusing him of robbery. (*Id*. at pp. 996–997.) In finding that the mother's accusation was not admissible as an adoptive admission, the Court of Appeal explained that "in light of the distinctive nature of text messaging, the receipt of a text message does not automatically signify prompt knowledge of its contents by the recipient, and furthermore, the lack of a text response by the recipient does not preclude the possibility that the recipient responded by other means, such as a phone call." (*Id*. at p. 999.) The Court further noted that the text exchange at issue "was not instantaneous but rather unfolded over a 20-minute period," "[t]here was no evidence as to whether and when [the defendant] read the text message in which his mother suggested he had robbed multiple local stores," and the defendant "emphatically texted his mother, 'Stop telling lies!!!' " (*Ibid*.)

20

In this case, by contrast, the text exchanges at issue did not end with Hurtado making an accusatory statement and Carrera failing to respond.  Rather, Carrera responded to Hurtado's text messages within minutes or even seconds.  Although Carrera's responses did not directly address each of Hurtado's accusatory statements, they reasonably supported an inference that he read the entirety of Hurtado's text messages in real time, and thus, had knowledge of their contents.  Moreover, while Carrera ended one of their text exchanges by telling Hurtado to stop texting him, he never denied her indirect accusations that he committed a crime and decided to flee.  On this record, trial court reasonably could find that Hurtado sent the accusatory text messages " ' "under circumstances that would normally call for a response if the statement were untrue" ' " and that Carrera responded with " ' "silence, evasion, or equivocation." ' "  (*People v. Jennings* (2010) 50 Cal.4th 616, 661.)

Accordingly, we conclude the trial court did not abuse its discretion when it admitted the challenged evidence under the exception for adoptive admissions.  We also reject Carrera's related claim that the admission of the evidence violated his constitutional right to due process.  As the Supreme Court has made clear, " ' "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' " ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1116.)  For these reasons, Carrera's claim of instructional error likewise fails. Because the trial court properly concluded that the messages were admissible, it did not err in giving the jury the standard CALCRIM instruction on adoptive admissions.

### 3. Admission of firearm photographs from Carrera's Facebook account

Carrera next challenges the trial court's admission of two photographs of a firearm that were posted on Carrera's Facebook account. He claims the photographs were irrelevant and unduly prejudicial because there was no evidence linking that firearm to the one used in the shooting in this case. Carrera also contends the admission of the evidence deprived him of his constitutional right to due process. We conclude the trial court did not abuse its discretion or violate due process in admitting the photographs.

#### 3.1 Governing law

" ' "The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.) Under Evidence Code section 352, evidence is unduly prejudicial if it " ' "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." ' " (*People v. Carter*, at p. 1168.)

In general, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but

22

only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; see *People v. Riser* (1956) 47 Cal.2d 566, 577 [trial court erred in admitting evidence of Colt revolver found in defendant's possession after murders where evidence showed weapon actually used was Smith and Wesson revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648.)  On the other hand, "[e]vidence that shortly before the murders defendant possessed a firearm that could have been the murder weapon" may be "relevant and admissible as circumstantial evidence that he committed the murders."  (*People v. Sanchez* (2019) 7 Cal.5th 14, 56 [no error in admitting evidence that defendant possessed firearm around time of murders where firearm described by witnesses could have been the one used in murders]; see *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [no error in allowing testimony that defendant kept a gun even though witnesses did not establish gun necessarily was the murder weapon because it might have been].)  Moreover, "evidence of weapons unconnected to the crime may be relevant for other purposes."  (*People v. Merriman* (2014) 60 Cal.4th 1, 81.)  For instance, evidence of firearms that were connected to the defendant but not to any of the charged crimes could be relevant to proving that "he was a gang member at war with a rival gang," and thus, had a gang-related motive for the crimes.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1073.)

### 3.2    The trial court did not err in admitting the challenged photographs

We first address the People's argument that Carrera forfeited his challenge to the photographic evidence by failing to renew his objection to it during trial.  Although Carrera filed a pretrial motion in limine to exclude any images of firearms and

related testimony taken from his Facebook posts, the record does not show whether the trial court ever ruled on such motion. Instead, the record shows that, at a hearing held prior to start of the People's case-in-chief, the court indicated that it needed to see the photographs before making its ruling. Without objection, the court later admitted the evidence during the prosecution's direct examination of the investigating detective, who testified that the photographs were posted on Carrera's Facebook account on November 30, 2019, which was 12 days before the shooting in this case. Because there is no indication in the record that Carrera ever renewed his objection to this evidence, we agree with the People that he forfeited his claim on appeal. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [while a properly directed motion in limine may preserve a claim for appeal, "the proponent must secure an express ruling from the court"].) In any event, even if the claim was not forfeited, it fails on the merits.

Here, neither the murder weapon nor any bullet casings were ever found. On cross-examination, the detective was asked whether the police were able to determine the type or caliber of firearm that was used in the shooting. In response, he indicated that they may have tried to obtain that information, but he could not recall. When asked whether the firearm depicted in the photographs had anything to do with the charged crimes, the detective responded that Carrera possessed that gun two weeks before the murder, but he did not know if it was the same one used in the shooting.

Thus, this was not a case where the prosecution relied on evidence that a specific type of firearm was used in the charged offense, and then sought to introduce evidence of other firearms possessed by the defendant. Rather, the detective acknowledged

24

that he did not know what type or caliber of firearm was used in the murder. As a result, he could not rule out the possibility that it was the same one depicted in Carrera's Facebook photographs. The detective also testified that the firearm in the photographs could be a .357, which was the same caliber of gun that Rojas saw in Carrera's possession near the time of the shooting. While Rojas described that gun as a chrome revolver, the photographs of the black gun posted on Carrera's Facebook account supported an inference that he had access to firearms two weeks before the shooting, which corroborated Rojas's statement to the police that Carrera was armed around the time the murder occurred. In addition, on the same day that Carrera posted the photographs, he also posted a derogatory statement about the MS-13 gang, which supported the inference that Carrera remained active in the North Hollywood Locos, and that the use of guns was part of the ongoing rivalry between his gang and the MS-13 gang. Under these circumstances, the trial court reasonably could have found that the photographs of the firearm were relevant and admissible.

Furthermore, the admission of the evidence was not unduly prejudicial. The photographs and related testimony were a small portion of the evidence presented at trial and were not uniquely likely to evoke an emotional bias. The jury heard other evidence tending to establish that Carrera was in possession of a firearm at the time of the murder, and that he had a gang-related motive for firing into a car occupied by Palomares and his girlfriend. In his cross-examination of the detective, Carrera's attorney elicited testimony that it was common for gang members to post pictures of themselves with firearms on their social media accounts, and that Palomares also had done so around the time of the shooting.

25

On this record, the trial court reasonably could have found that the probative value of the evidence was not substantially outweighed by any potential for prejudice.

Carrera's claim that the admission of the photographs violated his constitutional right to due process also fails. " 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jones* (2013) 57 Cal.4th 899, 949.) Because the proffered evidence was both relevant and not unduly prejudicial, there was no abuse of discretion or violation of due process in its admission.

**4.     Admission of evidence of Hurtado's no contest plea**

Carrera argues the trial court erred in admitting evidence of Hurtado's no contest plea to being an accessory after the fact. He asserts the evidence should have been excluded because it was irrelevant and unduly prejudicial, and its admission violated his constitutional rights to freedom of association and a fair trial. We conclude the trial court did not err in admitting the evidence related to Hurtado's plea.

**4.1     Relevant background**

Prior to trial, Carrera filed a motion in limine to exclude any testimony concerning Hurtado's no contest plea in this case on the ground that it could not be "considered as evidence of the guilt of any other person, and is therefore irrelevant." At the hearing on the motions in limine, the prosecution argued that the factual basis for the plea was relevant to showing that Hurtado assisted Carrera in fleeing California shortly after the shooting. The prosecutor asserted that if Hurtado refused to admit those underlying facts in her testimony at trial, then the statements contained in the factual basis for her plea would be admissible.

26

The trial court agreed with the prosecution the Hurtado could be impeached with her plea admissions in the event that she denied engaging in the acts described in the factual basis for her plea.

At trial, Hurtado was asked about two cell phone numbers that were used to communicate with Carrera around the time of the shooting. She testified that she could not recall whether she had one of those numbers because her memory was "really fuzzy" due to mental stress and medication. Even after the prosecution attempted to refresh her recollection with the transcript of her plea admissions, Hurtado continued to testify that she could not remember if that number belonged to her. At that point, with the court's permission, the prosecution read back Hurtado's plea admission that she was in possession of cell phones with those two numbers between November 2019 and January 2020. When Hurtado was asked whether she provided financial assistance to Carrera following the shooting, she again testified that she could not recall and that reviewing the transcript of her plea would not help refresh her recollection. The court then allowed the prosecution to read back Hurtado's plea admission that she provided financial assistance to Carrera between December 31, 2019, and January 31, 2020.

On cross-examination, Hurtado testified that she last spoke with Carrera "[r]ight before [she] was charged." When asked whether she received any information about a crime that occurred in December 2019 in which Carrera was involved, Hurtado replied, "I don't know anything about any crime." On redirect, the prosecution asked Hurtado whether she was claiming that she pled no contest to an accessory charge "in a case [you] know nothing about." Hurtado testified that her attorney advised her to take the plea deal, but did not tell her

27

what the murder in this case was about and only said she was being charged as an accessory.  She also testified that she "had no idea what [she] was pleading to," and that she accepted the deal because she "just wanted it to be over."  When asked what she actually knew about the case, Hurtado stated that she only knew that Carrera was charged with a murder and she was accused of being an accessory for helping him.

### 4.2   The trial court did not err in admitting the evidence related to Hurtado's plea

As a general rule, "evidence regarding the guilty plea or conviction of a coparticipant in a crime is not admissible to prove guilt of a defendant."  (*People v. Neely* (2009) 176 Cal.App.4th 787, 795; see *People v. Leonard* (1983) 34 Cal.3d 183, 188–189.)  "The rationale for the rule is that a guilty plea or conviction of a participant is irrelevant to whether another person was positively and correctly identified as a coparticipant, and merely invites the inference of guilt by association."  (*People v. Neely*, at p. 795.)  Similarly, evidence of a coparticipant's guilty plea "which is more prejudicial than probative when offered to raise an inference of the defendant's guilt is per se more prejudicial than probative when offered simply to bolster the credibility of another witness."  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322.)

Carrera argues the trial court erred in admitting evidence of Hurtado's no contest plea because it permitted an improper inference of his guilt by association.  In particular, he asserts the evidence allowed the jury to infer that he must have committed the charged crimes because his girlfriend admitted to helping him avoid prosecution for those crimes.  However, the evidence concerning Hurtado's plea was not offered to prove that Carrera was the person who committed the drive-by shooting, nor was it

28

offered to bolster the credibility of any witness.  Rather, it was introduced for the purpose of impeaching Hurtado with her plea admissions after she testified that she could not recall engaging in the actions that formed the factual basis for her plea.  The prosecution also asked a limited number of questions about the plea on redirect after Hurtado testified that she knew nothing about the crimes at issue in this case.

Under Evidence Code section 1235, "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (*Ibid*.)  Evidence Code section 770 allows the admission of a prior inconsistent statement provided that the "witness was so examined while testifying as to give him an opportunity to explain or to deny the statement." (*Id*., subd. (a).)  Our Supreme Court has explained that " ' " '[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement.' " ' " (*People v. Homick* (2012) 55 Cal.4th 816, 859.)  Thus, " ' "[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.]  As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." ' " (*Ibid*.)

In this case, Hurtado testified that she could not recall whether she possessed the cell phone numbers that were used to communicate with Carrera in the month following the shooting and whether she financially supported Carrera during that time.  Even after she was given an opportunity to review the transcript of her plea admissions, Hurtado maintained that she could not

remember engaging in these particular acts. Because there was a reasonable basis for concluding that Hurtado's claimed lack of memory was untruthful, the trial court properly allowed the prosecution to impeach Hurtado with the prior inconsistent statements that were contained in the factual basis for her plea. Later in her testimony, Hurtado also denied knowing anything about the crimes that were charged in this case. The prosecution then sought to impeach Hurtado's credibility on this issue by asking why she would agree to a plea in a case that she knew nothing about. The plea agreement itself was not offered into evidence, and neither the prosecution nor the defense made any reference to Hurtado's plea during their closing arguments.

" 'Admissibility of the plea turns on the purpose for which it is offered. When that purpose is to further the jury's difficult task of evaluating credibility, it is relevant and admissible without reference to the identity of the offering party.' " (*People v. Mackey* (2015) 233 Cal.App.4th 32, 119 [evidence of coparticipant's guilty plea was relevant to jury's credibility assessment of his trial testimony].) Here, the trial court did not abuse its discretion when it admitted the evidence related to Hurtado's no contest plea over Carrera's relevance objection in his motion in limine. The testimony regarding the plea was narrow in scope and tailored toward impeaching Hurtado's credibility based on her refusal to admit the acts underlying the factual basis for her plea, and any knowledge of the charges in this case. Carrera also had an opportunity to fully cross-examine Hurtado about this evidence and whether her claimed lack of memory and knowledge of the case were credible. Because the evidence was relevant and not unduly prejudicial, Carrera's constitutional claim likewise lacks merit.

30

## 5.     Cumulative error

Carrera asserts the cumulative effect of the claimed errors deprived him of due process of law and a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Here, Carrera received a fair trial and has failed to show any cumulative error requiring reversal of his convictions.

## 6.     Firearm enhancements in counts 2 through 4

Carrera raises two arguments regarding the jury's findings on the firearm enhancement allegations in counts 2 through 4. In the verdict form for each of these counts, the jury found true the allegation that, in the commission of the charged offense, Carrera personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c). As to count 2, Carrera asserts that his sentence must be corrected because the trial court erroneously imposed a 25-year term for the firearm enhancement under section 12022.53, subdivision (d), rather than the 20-year term required under subdivision (c). As to counts 3 and 4, Carrera argues that the jury's true findings on the firearm enhancements must be stricken because the offenses charged in those counts do not qualify for an enhancement under section 12022.53, subdivision (c). The People contend that the judgment need not be modified because the reference to section 12022.53, subdivision (c), in the verdict forms was a clerical error, and thus, the trial court properly imposed the enhancements under subdivision (d) of the statute. We agree with the People.

31

" ' " ' 'A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court.' [Citations.]" [ Citations.] "The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed." ' " (*People v. Jones* (2014) 230 Cal.App.4th 373, 378–379.) "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." (*People v. Webster* (1991) 54 Cal.3d 411, 447.) "Where the error is in the recording of the judgment, as opposed to in the rendering of the judgment, it is clerical error which may be disregarded or corrected." (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1273, citing *People v. Trotter* (1992) 7 Cal.App.4th 363, 370.)

Section 12022.53 establishes a tiered system of sentencing enhancements for certain felonies involving firearms. (*People v. Tirado* (2022) 12 Cal.5th 688, 693.) Subdivision (b) of the statute mandates the imposition of a 10-year enhancement for the personal use of a firearm in the commission of one of those felonies; subdivision (c) requires the imposition of a 20-year enhancement for the personal and intentional discharge of a firearm; and subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death to a person other than an accomplice. (§ 12022.53, subds. (b)–(d).) Attempted murder is among the felonies that are subject to an enhancement under subdivisions (b), (c), and (d) of the statute. (*Id*., subds. (a)(1), (a)(18), (b)–(d).) While shooting at an occupied vehicle and shooting from a motor vehicle are also subject to an enhancement under section 12022.53, subdivision (d), they are

32

not among the felonies that qualify for an enhancement under subdivision (b) or (c). (*Id.*, subds. (c)–(d).)

In this case, the charging information alleged firearm enhancements in counts 1 through 4. As to each of those counts, the enhancements were alleged under section 12022.53, subdivisions (b), (c), and (d). At trial, however, the court did not instruct the jury on any enhancements alleged under either subdivision (b) or (c) of the statute. Rather, the court solely instructed the jury on the firearm enhancements with CALCRIM 3149, which governs the enhancement for the personal discharge of a firearm causing death or great bodily injury under section 12022.53, subdivision (d). As instructed by the court, the jury was told that, to prove the firearm enhancement allegations in counts 1 through 4, the People had to prove that (1) the defendant personally discharged a firearm during the commission of that crime, (2) the defendant intended to discharge the firearm, and (3) the defendant's act caused the death of a person.

In the verdict form for count 1, the murder charge, the jury was asked whether, in the commission of the offense, Carrera "personally and intentionally discharged a firearm, to wit, a handgun, which caused great bodily injury and death to the victim, within the meaning of Penal Code Section 12022.53(d)." The jury found the section 12022.53, subdivision (d) allegation in count 1 to be true. The verdict forms for counts 2, 3, and 4 asked the jury whether, in the commission of the offense, Carrera "personally and intentionally discharged a firearm, to wit, a handgun, within the meaning of Penal Code Section 12022.53(c)." For each of those counts, the jury found the section 12022.53, subdivision (c) allegation to be true. Neither party raised any objections to the verdict forms, or brought the apparent error in

33

the verdict forms for counts 2 through 4 to the trial court's attention.

At sentencing, the trial court imposed a 25-year firearm enhancement under section 12022.53, subdivision (d), on count 1. The court also imposed a 25-year firearm enhancement under section 12022.53, subdivision (d), on count 2. The court stayed the three-year terms imposed on counts 3 and 4 under section 654, but did so without imposing a firearm enhancement on either count. There was no objection to the imposition of the section 12022.53, subdivision (d) enhancement on count 2.

Based on the totality of the record, it is clear the jury intended to find that, as to each count for which a firearm enhancement was alleged, Carrera personally and intentionally discharged a firearm causing Zuniga's death within the meaning of section 12022.53, subdivision (d). There can be no dispute that Carrera had notice of the applicable firearm enhancements for counts 1 through 4. The information specifically alleged a section 12022.53, subdivision (d) firearm enhancement for each of those counts. Furthermore, the jury was properly instructed on the elements of a section 12022.53, subdivision (d) enhancement, and was not given any instructions for an enhancement under subdivision (b) or (c). Although neither the prosecution nor the defense discussed the firearm enhancements in their closing arguments to the jury, the People's theory of the case throughout the trial was that Carrera was guilty on each count because he fired a single shot from his car into the car occupied by Zuniga and Palomares, killing Zuniga. Thus, when the jury was asked in the verdict form for count 1 whether Carrera "personally and intentionally discharged a firearm . . . which caused great bodily

34

injury and death to the victim, within the meaning of Penal Code Section 12022.53(d)," the jury answered "True."

Moreover, as our Supreme Court has recognized, multiple firearm enhancements may be imposed under section 12022.53, subdivision (d), based on the death or great bodily injury of a single victim who is shot during the simultaneous commission of different qualifying offenses. (*People v. Palacios* (2007) 41 Cal.4th 720, 726–727; *People v. Oates* (2004) 32 Cal.4th 1048, 1055.) Here, once the jury found that, as to count 1, Carrera personally and intentionally discharged a firearm causing Zuniga's death, it also made the necessary factual findings for a section 12022.53, subdivision (d) enhancement as to counts 2, 3, and 4, since Carrera simultaneously committed the offenses in those counts when he fired the single shot that killed Zuniga.

Under these circumstances, the jury's intent to impose a section 12022.53, subdivision (d) firearm enhancement on counts 2 through 4 is "unmistakably clear," and Carrera's "substantial rights suffered no prejudice." (*People v. Webster*, *supra*, 54 Cal.3d at p. 447; accord, *People v. Camacho*, *supra*, 171 Cal.App.4th at p. 1272.) Accordingly, the trial court properly disregarded the error in the verdict forms for counts 2 through 4 in sentencing Carrera, and no modification of the judgment is required.

## DISPOSITION

The judgment is affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.